## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

IKB INTERNATIONAL, S.A., in
Liquidation and IKB DEUTSCHE
INDUSTRIEBANK, A.G.,

     Plaintiffs,

  v.

WILMINGTON TRUST COMPANY, as
Trustee (and any predecessors or
successors thereto); M&T BANK
CORPORATION as successor by merger
to the WILMINGTON TRUST
COMPANY, as Trustee, and any
predecessors or successors thereto),

     Defendants,

  and

CWABS TRUST 2005-HYB9; *et al.*,

     Nominal Defendants.

1:17-cv-1351

Hon. John E. Jones III

## MEMORANDUM & ORDER

### May 14, 2018

The case before us arises from the smoking rubble of the epic housing

market collapse in the late 2000s. Plaintiffs, IKB International, S.A. ("IKB S.A.")

and IKB Deutsche Industriebank, A.G. ("IKB A.G."), bring this action against

Defendants Wilmington Trust Company ("Wilmington Trust") and M&T Bank

Corporation ("M&T")[1] as successor by merger to Wilmington Trust, alleging breach of contract and bad faith. Plaintiffs also name fifteen Delaware statutory trusts as nominal defendants. Presently pending before the Court is Defendants' Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Doc. 61). For the reasons that follow, we shall grant Defendants' Motion.

## I.    FACTUAL BACKGROUND

We take the facts from Plaintiffs' Complaint and assume them to be true.

This case proceeds against the backdrop of complex investment vehicles known as residential mortgage-backed securities ("securities"). The process of creating the securities begins with the prospective homebuyer obtaining a mortgage loan. (Compl. ¶ 38).[2] The lenders who originate these loans sell them in bulk to an affiliate of the bank typically known as a "sponsor." (*Id.*). The sponsor creates an entity known as a "depositor" who transfers (or "deposits") the pool of loans into a trust. (*Id.*). In this case, several trusts were created in Delaware pursuant to the Delaware Statutory Trust Act, 12 Del.C. §§ 3801, *et seq.* (*Id.*). The trusts are governed by trust agreements. A trustee known as the "owner trustee"

---

[1] In their opening brief, Defendants state that the parties would stipulate to the dismissal of M&T from the action because M&T did not merge with Wilmington Trust and, therefore, is not its successor. Defendants cite to a prior brief that Plaintiffs filed on the docket indicating the same. (Doc. 42, n. 1). Although the Court does not see any such stipulation on the docket, we will proceed under the assumption that both sides agree to the dismissal of claims specifically against M&T.

[2] The Complaint in this matter is found at Exhibit B to Document 1.

acts on behalf of those who hold certificates to the trust. To service the mortgage loans held by the trust, the sponsor and depositor appoint one or more entities to act as "servicers." (*Id.* at ¶ 42). The trust, referred to as the "issuer," issues securities, which are essentially bonds and pay a yield out of the cash flow received from the mortgage loans. The securities are issued pursuant to indenture agreements. An "indenture trustee" is appointed and acts on behalf of the noteholders, or the investors who purchase the securities. In addition to the trust and indenture agreements, several other agreements covering sales, servicing, and administration of the loans and trusts interlock and work together as "governing agreements," also referred to as the "basic documents."

In the case before us, IKB S.A. purchased thirty-two different securities issued by various trusts between 2005 and 2007. (*Id.* at ¶ 15). On November 20, 2008, IKB S.A. sold four of these securities to unnamed third parties and the remaining twenty-eight securities to IKB A.G. (*Id.* at ¶ 16). Two weeks later, IKB A.G. sold these securities to another company, Rio Debt Holdings (Ireland) Limited ("Rio"), which then, over the next few years, sold thirteen of the securities to other, unnamed third parties. (*Id.* at ¶ 17). On May 9, 2012, and on December 22, 2015, Rio assigned all claims arising from the fifteen securities it still owned back to IKB A.G. (*Id.* at ¶ 18). The total value of these fifteen securities when they were first purchased was $168 million. (*Id.* at ¶ 1).

Plaintiffs allege that Defendants breached their contractual obligation to protect the trust estates by permitting other entities, namely the Sellers, Indenture Trustees, and Servicers, to breach *their* duties. The Sellers made representations and warranties regarding the quality of the loans transferred to the trusts. (*Id.* at ¶159). The loans, however, were substantially lower quality than represented. As a result of the misrepresentations, the delinquency rates experienced by the trusts ranged from an average of 24 percent to 31 percent between 2009 and 2011. (*Id.* at ¶ 96). The Indenture Trustees, meanwhile, failed to ensure that the loan files for the mortgage loans in the trust were complete. (*Id.* at ¶ 83). Consequently, the Indenture Trustees also failed to provide notice of defaults and demand that the Sellers cure defective mortgage loans. (*Id.* at ¶ 72). Finally, the Servicers frequently conducted the foreclosure process imprudently, often with self-dealing, which resulted in reduced realization from the foreclosure sales. (*Id.* at ¶ 89). As a result of the alleged failures, the trusts collectively lost a net value of over $2.3 billion. (*Id.* at ¶ 95).

Plaintiffs claim that these failures of the Sellers, Indenture Trustees, and Servicers are equally failures of Wilmington Trust. Plaintiffs allege that Wilmington Trust, as Owner Trustee of the various trusts, had a duty to protect the trust estate and ensure that the Indenture Trustees and Servicers complied with their duties. (*Id.* at ¶ 98). Plaintiffs claim that Wilmington Trust knew of the dire

state of the trusts and took no action. (*Id.* at ¶ 234). Furthermore, Plaintiffs allege that Wilmington Trust failed to give notices of defaults per the governing agreements. (*Id.* at ¶ 315-16).

## II.    PROCEDURAL HISTORY

Plaintiffs originally initiated this action by filing a Complaint in the Supreme Court of New York on May 27, 2016. (Compl.). On June 24, 2016, Defendants timely removed the matter to the United States District Court for the Southern District of New York. (Doc. 1). On September 14, 2017, upon motion of Defendants to transfer venue, the case was transferred to the District of Delaware. (Doc. 35).

Defendants filed the instant Motion to Dismiss, with supporting brief, on January 19, 2018. (Docs. 61, 62). Pursuant to a stipulated modified briefing schedule, Plaintiffs timely filed their answering brief on March 20, 2018. (Doc. 67). Defendants filed their reply brief on April 19, 2018. (Doc. 72). Having been fully briefed, the Motion is ripe for our review.

## III.    STANDARD OF REVIEW

In considering a motion to dismiss pursuant to Rule 12(b)(6), courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. County of Allegheny*,

515 F.3d 224, 231 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)). In resolving a motion to dismiss pursuant to Rule 12(b)(6), a court generally should consider only the allegations in the complaint, as well as "documents that are attached to or submitted with the complaint, . . . and any matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case." *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006).

A Rule 12(b)(6) motion tests the sufficiency of the complaint against the pleading requirements of Rule 8(a). Rule 8(a)(2) requires that a complaint contain a short and plain statement of the claim showing that the pleader is entitled to relief, "in order to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint attacked by a Rule 12(b)(6) motion to dismiss need not contain detailed factual allegations, it must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a civil plaintiff must allege facts that 'raise a right to relief above the speculative level. . . ." *Victaulic Co. v. Tieman*, 499 F.3d 227, 235 (3d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). Accordingly, to satisfy the

plausibility standard, the complaint must indicate that defendant's liability is more than "a sheer possibility." *Iqbal*, 556 U.S. at 678. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

Under the two-pronged approach articulated in *Twombly* and later formalized in *Iqbal*, a district court must first identify all factual allegations that constitute nothing more than "legal conclusions" or "naked assertions." *Twombly*, 550 U.S. at 555, 557. Such allegations are "not entitled to the assumption of truth" and must be disregarded for purposes of resolving a 12(b)(6) motion to dismiss. *Iqbal*, 556 U.S. at 679. Next, the district court must identify "the 'nub' of the . . . complaint – the well-pleaded, nonconclusory factual allegation[s]." *Id.* Taking these allegations as true, the district judge must then determine whether the complaint states a plausible claim for relief. *See id.*

However, "a complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." *Phillips*, 515 F.3d at 231 (citing *Twombly*, 550 U.S. at 556-57). Rule 8 "does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Id.* at 234.

## IV. DISCUSSION

Plaintiffs' sprawling Complaint, consisting of 329 paragraphs across 106 pages, alleges four claims against Wilmington Trust: (1) that Wilmington Trust failed to enforce the obligations of the various parties under the governing agreements with respect to the mortgage loan files; (2) that Wilmington Trust was aware of breaches of representations and warranties by the Sellers and failed to provide notice of those breaches or demand that the breaches and defaults be cured; (3) that Wilmington Trust failed to protect investors with respect to breaches by the Servicers by not compelling the Indenture Trustees' obligation to enforce the trusts' rights; and (4) that Wilmington Trust acted in bad faith by failing to protect the trust estate and give notice of defaults. Plaintiffs refer to the first three claims in their single count for breach of contract. Plaintiffs' bad faith claim also incorporates the first three breaches.

Wilmington Trust argues that it was not responsible for any of the duties Plaintiffs allege it breached. Wilmington Trust further argues that Plaintiffs have failed to specify an implied duty that Wilmington Trust breached in bad faith, and that the bad faith claim itself is duplicative of the breach of contract claim. Finally, Wilmington Trust suggests that three bars to litigation necessarily limit Plaintiffs' claims: (1) that IKB S.A. has no standing to assert claims, (2) that certain claims are barred by a contractual provision known as the "no action" clause, and (3) that

certain claims are barred by the statute of limitations. We will begin with the three purported bars to litigation.

## A. Bars to Litigation

### 1. Standing

Wilmington Trust argues that IKB S.A. lacks standing to bring any claims because it sold all of its securities to IKB A.G. and other unnamed third parties. Wilmington Trust contends that the securities are governed by New York state law, and that under New York law, any claims related to the securities passed to the buyer upon their sale. Plaintiffs counter that the law of Luxembourg applies because the sale of IKB S.A.'s assets "would have occurred" in Luxembourg. (Doc. 67, p. 21). Plaintiffs further assert that, under Luxembourg law, claims accruing to a seller prior to the sale remain with the seller even after the sale.

The securities here were issued pursuant to the indenture agreements, which all contain a choice of law provision stating that the agreements are governed by New York law. (Doc. 63-17). By including the choice of law provision, the parties clearly intended to avoid a conflict-of-laws analysis and apply New York law in determining parties' "obligations, rights and remedies." *See Ministers and Missionaries Ben. Bd. v. Snow*, 45 N.E.3d 917, 918 (N.Y. 2015) ("where parties include a New York choice-of-law clause in a contract, such a provision demonstrates the parties' intent that courts not conduct a conflict-of-laws

analysis"). Plaintiffs' claims here arise under the indenture agreements and the duties pursuant to those agreements that Plaintiffs allege were breached. By the express terms of the agreements, these claims are governed by the law of New York. To find otherwise would be to obliterate the choice-of-law provision and allow any noteholder to circumvent the express terms of the indenture agreements by selling its notes outside of New York. "In interpreting a contract under New York law, words and phrases . . . should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 59 F.Supp.3d 654, 660 (D. Del. 2014) (quoting *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005)).

New York law is clear that "[w]hen a security or bond is sold, the property rights associated with the bond travel with the bond, including any claims arising out of breach of the rights associated with the bond. . . . Thus, under New York law, former holders have no standing to enforce the securities or their governing agreements." *FDIC v. Citibank N.A.*, 1:15-cv-6574, 6560, and 6570, 2016 WL 8737356, at *4 (S.D.N.Y. Sept. 30, 2016). Plaintiffs state in their Complaint that IKB S.A. sold four of its securities to unnamed third parties and the remainder of its securities to IKB A.G. on November 20, 2008. Upon the sale of the securities, IKB S.A. transferred all claims it may have had under the indenture agreements.

Therefore, IKB S.A. lacks standing to assert any claims under the agreements.

Accordingly, any claims asserted by IKB S.A. shall be dismissed.

## 2.    "No action" Clause

Wilmington Trust next argues that IKB A.G. cannot bring its claims because it failed to comply with conditions precedent set forth in a so-called "no action" clause to the indenture agreements. The "no action" clause states that

> No Holder of any Note shall have any right to institute any Proceeding, judicial or otherwise, with respect to this Indenture, or for the appointment of a receiver or trustee, or for any other remedy hereunder, unless . . .
> (i) such Holder has previously given written notice to the Indenture Trustee of a continuing Event of Default;
> (ii) the Holders of not less than 25% of the aggregate Note Balance of the Notes have made a written request to the Indenture Trustee to institute such Proceeding in respect of such Event of Default in its own name as Indenture Trustee hereunder;
> (iii) such Holder or Holders have offered to the Indenture Trustee indemnity reasonably satisfactory to it against the costs, expenses and liabilities to be incurred in complying with such request;
> (iv) the Indenture Trustee for 60 days after its receipt of such notice of request and offer of indemnity has failed to institute such Proceedings; and
> (v) no direction inconsistent with such written request has been given to the Indenture Trustee during such 60-day period by the Holders of a majority of the Note Balances of the Notes.

(Doc. 63, Ex. L). Wilmington Trust argues that IKB A.G. failed to give written notice to the Indenture Trustees, demanding that they file suit against Wilmington Trust. IKB A.G. does not claim to have given a written demand, but rather argues that Second Circuit precedent excuses the written demand prerequisite as "absurd"

in cases like this. *See Cruden v. Bank of New York*, 957 F.2d 961, 968 (2d Cir. 1992). In *Cruden*, the Second Circuit determined that a similar demand requirement was inapplicable for suits against an Indenture Trustee because to hold otherwise would be to absurdly require "the debenture holders to ask the Trustee to sue itself." *Id.*

Wilmington Trust argues that, because the Indenture Trustees are not defendants in this action, *Cruden* does not apply. IKB A.G., however, suggests that the present matter is functionally the same as the facts in *Cruden* because the principal claim of the Complaint is that Wilmington Trust's breach was its failure to prevent the Indenture Trustees' breaches. Wilmington Trust, in turn, argues that prior courts have upheld "no action" clauses where Indenture Trustees would implicate their own misconduct by filing suit. *See, e.g., SC Note Acquisitions, LLC v. Wells Fargo Bank, N.A.*, 934 F.Supp.2d 516, 531 (E.D.N.Y. 2013) (holding that "no action" clauses "have been enforced when they would require the trustee to sue one of the other managers of the trust that the trustee is required to supervise.").

There is no question that the Indenture Trustees are not defendants to this lawsuit and, thus, technically would not have been asked to sue themselves. However, it is equally true that the Indenture Trustees would not merely be "implicating" their own misconduct in pursuing a claim against "other managers" who engaged in their own misconduct, as contemplated in *SC Note Acquisitions,*

*LLC*. In this case, the claims against Wilmington Trust fundamentally rest on the alleged breaches by the Indenture Trustees. Indeed, it would be the equivalent of a subordinate suing his supervisor for failing to prevent the subordinate's *in*subordination. This appears to be a close cousin of asking the Indenture Trustees to sue themselves and veers toward the absurd. On this unusual set of facts, therefore, we find that IKB A.G. is excused from the written demand requirement of the "no action" clause.

Wilmington Trust further suggests that even if the demand requirement is absurd, the other requirements of the "no action" clause – in particular, obtaining support from twenty-five percent of the note holders – should still apply. The Southern District of New York carefully considered this very question in light of *Cruden*. In *Blackrock Core Bond Portfolio v. U.S. Bank National Association*, 165 F.Supp.3d 80 (S.D.N.Y. 2016), the Southern District of New York conducted a detailed analysis of a substantially similar "no action" clause. The Court construed the five conjunctive sub-parts of the clause as building blocks, each providing a foundation for the next. 165 F.Supp.3d at 98. The Court likened the elimination of one sub-part as removing "one of the legs of a stool," which renders the entire clause unenforceable. *Id.* We find the Court's analysis highly persuasive and adopt its reasoning here. By its plain language, the "no action" clause was meant to operate as a cohesive whole, a series of conjunctive steps for initiating a suit

related to the indenture agreements. Where one step in the process is excused, the remaining steps also fall. Thus, we find that IKB A.G.'s compliance with the "no action" clause is excused and does not act as a bar to litigation.

### 3.    Statute of Limitations

Finally, Wilmington Trust argues that the statute of limitations has already expired on some of IKB A.G.'s claims. Specifically, Wilmington Trust argues that claims associated with duties surrounding the closing of the trusts (collectively, the "closing duties") are time-barred. These claims include failing to "(1) take physical possession of loan files, (2) inspect the loan files for completeness, (3) provide notice of loan file deficiencies, and (4) require Sellers either to cure the documentation problems or repurchase or substitute another mortgage loan for the improperly documented mortgage loan. . . ." (Doc. 62, p. 29). Wilmington Trust states that the trusts all closed between 2004 and 2007, and the closing duties needed to be performed within a certain period of time set forth in the various indenture agreements, such as 180 or 360 days. (*Id.*). Thus, according to Wilmington Trust, the applicable statute of limitations for breach of contract, which is six years under New York law, N.Y. C.P.L.R. § 213, runs from the expiration of those time periods.

In its answering brief, IKB A.G. presents several arguments. First IKB A.G. argues that the statute of limitations is tolled by previously filed class actions that

include, as putative class members, thirteen of the trusts at issue in this matter. Second, IKB A.G. argues that Wilmington Trust, as a fiduciary, is estopped from relying on the statute of limitations. Finally, IKB A.G. argues that the six-year limitations period only began once Wilmington Trust failed to initiate an action against the Indenture Trustees within six years. Thus, according to IKB A.G., Wilmington Trust had six years to file suit against the Indenture Trustees, and when it failed to do so, IKB A.G. had another six years to file suit against Wilmington Trust.

Although IKB A.G.'s "twelve-year statute of limitations" theory is inventive, we are not persuaded. IKB A.G. alleges that Wilmington Trust breached its duties by failing to prevent the Sellers, Indenture Trustees, and Servicers from breaching their duties. According to the allegations, Wilmington Trust had a duty to ensure that the other managing entities complied with their duties. Thus, once the other entities breached their duties, Wilmington Trust was also in breach. To indicate now that Wilmington Trust's breach only triggered by not bringing suit within six years is inconsistent with the Complaint. Therefore, as it relates to the closing duties, we find that statute of limitations is calculated from moment the Sellers, Indenture Trustees, and Servicers breached their duties. Based on that calculation, IKB A.G.'s claims are out of time. As noted above, however, IKB A.G. argues that the statute of limitations should be equitably tolled because of

pending class action lawsuits and, alternatively, that Wilmington Trust is estopped from relying on the statute of limitations because it is a fiduciary.

"[T]he commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." *Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345, 353-54 (1983) (quoting *American Pipe & Const. Co. v. Utah*, 414 U.S. 538, 554 (1974)). "Once the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied." *Id.* at 354. Wilmington Trust argues that class action tolling does not apply here because IKB A.G. is not a putative class member to the prior class actions and Wilmington Trust is not named in the prior class actions. Although Wilmington Trust appears to make a persuasive argument, determining whether class action tolling applies in this matter requires a factual analysis that is beyond the record before us. At this early stage, we focus on the sufficiency of IKB A.G.'s allegations and only consider documents attached to or integral to the Complaint. We have limited information about the relevant class actions and find it would be premature and imprudent to rule on the applicability of tolling at this point in the litigation. Therefore, we will not dismiss the closing duties claims based on timeliness. Furthermore, because we will defer ruling on statute of limitations until the record is more developed, we will not consider at this time whether

Wilmington Trust is estopped from asserting a statute of limitations defense as a fiduciary.

In light of our above analysis, we now turn to Wilmington Trust's Rule 12(b)(6) argument that IKB A.G. failed to sufficiently state claims of breach of contract and bad faith.

## B.     Failure to State Claims

### 1.     Breach of Contract

IKB A.G.'s breach of contract claim arise out of both the indenture agreements and the trust agreements, which are governed by different laws. Breach of the indenture agreements, which are governed by New York law, requires a showing that (1) a contract exists, (2) plaintiff performed its obligations under the contract, (3) defendant breached its obligations, and (4) plaintiff suffered damages from the breach. *IPFS Corp. v. Manetta Enterprises, Inc.*, 71 N.Y.S.3d 359, 359 (N.Y. App. Div. 2018). The trust agreements are governed by Delaware law, which defines three elements to a breach of contract claim: (1) existence of a contract, (2) breach of a contractual obligation, and (3) damages suffered by the plaintiff as a result of the breach. *VLIW Technology, LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003). Wilmington Trust focuses its attention on the breach element, arguing that the duties allegedly breached were not, in fact, Wilmington Trust's responsibility. Thus, even in the event that those duties were breached,

Wilmington Trust would not be liable. We are faced, therefore, with a matter of contract interpretation. Under both New York and Delaware law, contract interpretation is a question of law appropriately resolved by the Court. *See Dreisinger v. Teglasi*, 13 N.Y.S.3d 432, 436 (N.Y. App. Div. 2015) ("where the intention of the parties may be gathered from the four corners of the instrument, interpretation of the contract is a question of law . . ."); *O'Brien v. Progressive Northern Ins. Co.*, 785 A.2d 281, 286 (Del. 2001) ("Under Delaware law, the interpretation of contractual language . . . is a question of law.").

As noted earlier, IKB A.G. asserts three claims within the scope of its breach of contract count: (1) that Wilmington Trust failed to enforce the obligations of the various parties under the governing agreements with respect to the mortgage loan files; (2) that Wilmington Trust was aware of breaches of representations and warranties by the Sellers and failed to provide notice of those breaches or demand that the breaches and defaults be cured; and (3) that Wilmington Trust failed to protect investors with respect to breaches by the Servicers by not compelling the Indenture Trustees' obligation to enforce the trusts' rights. We will consider each claim in turn.

### a. Mortgage Loan Files

The Complaint states that the Indenture Trustees had a duty "to ensure that key documents for the loans were included in the mortgage files and to create an

exception report identifying those mortgage loans for which the mortgage files were incomplete." (Compl. ¶ 83). In addition, "[t]he Seller was required to substitute compliant loans for the loans with incomplete files or else repurchase the loans." (*Id.*). IKB A.G. claims that Wilmington Trust breached its duty by allowing the Indenture Trustees and Sellers to disregard these obligations. IKB A.G. does not identify a particular provision that holds Wilmington Trust to this duty. Rather, IKB A.G. alleges that Wilmington Trust had a duty to "protect the trust estate." (*Id.*). IKB A.G. appears to rely on four provisions in the indenture agreements for the notion that Wilmington Trust had a duty to protect the trust estate: Sections 3.06, 3.08, 3.24, and 5.01. (Compl. ¶¶ 60, 62).

Section 3.06 provides that the Issuer — that is, the trust itself — will take steps "necessary or advisable" to "maintain or preserve the lien and security interest"; "perfect, publish notice of or protect the validity of any Grant made or to be made by this Indenture"; "cause the Issuer, the Servicer or the Master Servicer to enforce any of the rights to the Mortgage Loans"; or "preserve and defend title to the Trust and the rights of the Indenture Trustee and the Noteholders in the Trust against the claims of all persons and parties." (Compl. Ex. 6, Table 1). Similarly, in Section 3.08, the Issuer agrees to "punctually perform and observe all of its obligations" and may contract with other parties to help with meeting its duties. (*Id.*). Furthermore, the Issuer "will not take any action or permit any action to be

taken by others which would release any Person from any of such Person's covenants or obligations under any of the documents relating to the Mortgage Loans or under any instrument included in the Collateral." (*Id.*). Finally, Section 3.08 permits the Indenture Trustee and Securities Administrator to "exercise the rights of the Issuer to direct the actions of the Servicer and/or the Master Servicer pursuant to the Servicing Agreement." (*Id.*).

Sections 3.24 and 5.01 pertain to notices of default. Section 3.24 tasks the Issuer with giving "the Indenture Trustee, the Securities Administrator and the Rating Agencies prompt written notice of each Event of Default hereunder and under the Trust Agreement." (*Id.*) Section 5.01 requires the Issuer to "deliver to the Indenture Trustee and the Securities Administrator, written notice in the form of an Officer's Certificate, within five days after learning of the occurrence of any event which with the giving of notice and the lapse of time would become an Event of Default. . . ." (*Id.*)

Conspicuously absent from these sections is any reference to Wilmington Trust, as the Owner Trustee. In the Complaint, IKB A.G. casually restates the duties in Sections 3.06 and 3.08 as belonging to Wilmington Trust, but that is flatly contradicted by the plain language of the agreements. The duties are those of the Issuer, not of Wilmington Trust. With respect to Sections 3.24 and 5.01, IKB A.G.

confusingly acknowledges that the sections assign the duties to the Issuer, while simultaneously stating that these were obligations of Wilmington Trust.

To account for this discrepancy over who was responsible for these duties, IKB A.G. suggests that duties of the Issuers were also duties of Wilmington Trust because Wilmington Trust "controlled the trusts." (Compl. ¶ 58). IKB A.G. seems to fashion this argument from Section 2.01 of the trust agreements, which states that Wilmington Trust, as Owner Trustee, "***may*** conduct the business of the Trust, make and execute contracts and other instruments on behalf of the Trust and sue and be sued." (Compl. Ex. 6, Table 1). The language of Section 2.01, however, is obviously discretionary on its face. The trust agreements expressly relieve Wilmington Trust of the obligation to take action, even when authorized to do so. Section 4.01, for example, states that Wilmington Trust "is authorized, but shall not be obligated, except as otherwise provided in this Trust Agreement, to take all actions required of the Trust pursuant to the Basic Documents." (Doc. 63-2). Further, Section 6.01(g) provides that Wilmington Trust "shall be under no obligation to exercise any of the rights or powers vested in it or duties imposed by this Trust Agreement. . . ." (*Id.*). Thus, the authority of Wilmington Trust to act for the Issuer does not translate into an obligation to do so.

Notably, where the agreements assign the Issuer's duties to other entities, Wilmington Trust still is omitted. For example, Section 10.01 of the sale and

servicing agreements delegate the Issuer's duties under the indenture agreements to the Master Servicer. (Doc. 63, Ex. F). Similarly, Section 7.1 of the mortgage loan sale and contribution agreements assign the Issuer's duties to the Originator, who, in that capacity, would be known as the Administrator. (*Id.*). IKB A.G. claims these sections later impose duties upon Wilmington Trust when they require the delegated managing entities to "monitor the performance of the Issuer and . . . advise the Owner Trustee when action is necessary to comply with the Issuer's duties under the Indenture." (*Id.*). IKB A.G. interprets this language as imposing the obligations of the Issuer upon Wilmington Trust, but we are not persuaded by that reading. Where the agreements impose duties, they do so explicitly, in clear, unambiguous language. The agreements also make clear that Wilmington Trust, although authorized to take any of these actions, is under no obligation to do so. Within this context, a more reasonable reading of the agreement language is that, on occasion, Wilmington Trust may need to act so that the *delegated entities* can fully satisfy the Issuer's duties. IKB A.G. does not allege that the delegated entities could not fulfill the Issuer's duties because Wilmington Trust failed to take some requested action. Rather, IKB A.G. claims that the duties transferred to Wilmington Trust. We do not find that to be a reasonable interpretation.

IKB A.G. makes one final attempt to fashion a duty from the language of the agreements. Section 4.05 of the trust agreements states that Wilmington Trust

"shall not take any action . . . that is inconsistent with the purposes of the Trust set forth in Section 2.03" (Doc. 69, Ex. 4). Section 2.03, in turn, sets forth the purposes of the trusts, including "engag[ing] in such other activities as may be required in connection with the conservation of the Collateral and the making of distributions to the Certificateholder and the Noteholders. . . ." (Doc. 69, Ex. 5). IKB A.G. argues that the two sections, taken together, create a duty upon Wilmington Trust to take any necessary action to conserve the collateral. IKB A.G.'s line of reasoning, however, is problematic. Section 4.05 is a *negative* covenant that prohibits Wilmington Trust from taking inconsistent action, and negative covenants do not impose an affirmative duty to act. *See Alliance Data Systems Corp. v. Blackstone Capital Partners V L.P.*, 963 A.2d 746, 766 (Del. Ch. 2009) ("affirmative covenants require that a bound party take action while negative covenants forbid action . . . [and] liability under a negative covenant can only arise from an action. . . ."). Thus, IKB A.G.'s argument that Wilmington Trust should be liable for inaction based on a negative covenant fails. Furthermore, as already discussed, the agreements expressly state that Wilmington Trust is under no obligation to exercise any powers it is authorized to take.

Based on the foregoing analysis, we see no basis in reading a duty to "protect the trust estate" in the agreements. IKB A.G.'s breach of contract claim, however, includes two other "failures" to act, and we now turn to those allegations.

**b.      Representations and Warranties of Sellers**

IKB A.G. alleges that Wilmington Trust was obligated to notify the Servicers of any breaches of Sellers' representations and warranties related to the mortgage loans. (Compl. ¶ 84). IKB A.G. further alleges that Wilmington Trust "failed to enforce the Trusts' rights to demand that those breaches and defaults be cured." (*Id.*). Again, IKB A.G. does not point to any specific provisions that impose such duties upon Wilmington Trust. The agreements, however, unambiguously impose these duties on other managing entities. Section 2.03 of the servicing agreements, for example, states:

> Upon discovery by the Seller, the Depositor, the Servicer, the Master Servicer or a Responsible Officer of the Indenture Trustee or the Securities Administrator of a breach of any of the representations and warranties made by the Originator in the Mortgage Loan Sale and Contribution Agreement . . . which materially and adversely affects the value of, or the interests of the Trust or the Noteholders in, the related Mortgage Loan, the party discovering such breach shall give prompt written notice to the Originator.

(Doc. 63, Ex. T). It bears noting that while the provision specifically identifies several managing entities who may be in a position to learn of the Sellers' breaches, Wilmington Trust is not among them. The same provision further states that "the Indenture Trustee shall enforce the obligation of the Originator to use all reasonable efforts to cure such breach in all material respects or purchase such Mortgage Loan from the Trust or substitute an Eligible Substitute Mortgage Loan .

. . ." (*Id.*). Here, again, the duty to enforce the trusts' rights falls explicitly upon the Indenture Trustees, not Wilmington Trust.

Similarly, the indenture agreements provide that the Issuer, on request from the Indenture Trustee, "shall take all such lawful action as the Indenture Trustee may request to cause the Issuer to compel or secure the performance and observance by the Seller, the Servicer and the Master Servicer, as applicable, to each of their obligations to the Issuer under or in connection with the Mortgage Loan Sale and Contribution Agreement and the Servicing Agreement. . . ." (Doc. 63, Ex. N). IKB A.G. has not pointed to any language in the agreements making Wilmington Trust responsible for these duties. To the extent that IKB A.G. seeks to impose a general duty to "protect the trust estate," we have already dispensed with that argument above. A plain reading of the unambiguous terms of the agreements fails to support IKB A.G.'s allegations.

### c.    Servicing Failures

The third prong of IKB A.G.'s breach of contract claim alleges that Wilmington Trust failed to address uncured servicing defaults. IKB A.G. alleges that "Servicers regularly overcharged for various default services provided in connection with the mortgage loans. They also conducted foreclosures, maintenance of foreclosed properties and foreclosure sales imprudently, and often through self-dealing, which resulted in diminished realization from foreclosures."

(Compl. ¶ 89). Once again, IKB A.G. cites to no provisions imposing these duties upon Wilmington Trust.

The servicing agreements address this very issue, however. Section 4.01 of the servicing agreements imposes a duty upon the Master Servicer to "supervise, monitor and oversee the obligation of the Servicer to service and administer the Mortgage Loans . . . ." (Doc. 63, Ex. U). Section 4.03 further requires the Master Servicer to "enforce the obligations of the Servicer under this Agreement, and shall, in the event that the Servicer fails to perform its obligations . . . cause the Indenture Trustee to terminate the rights and obligations of the Servicer . . . ." (*Id.*). The sale and servicing agreements further impose upon the Master Servicer itself a duty to "service and administer the Mortgage Loans in accordance with the customary and usual standards of practice of prudent mortgage loan lenders. . . ." (*Id.*). Thus, the duty to oversee the servicing of the mortgage loans falls to the Master Servicer, and the duty to enforce obligations or cure defaults is imposed upon both the Master Servicer and the Indenture Trustee. Again, we see no basis for reading into the agreement a duty upon Wilmington Trust.

To the extent that we have been able to review the governing agreements, we find the language to be unambiguous. The duties that were allegedly breached were never expressly imposed on Wilmington Trust, but were specifically assigned to other managing entities. Furthermore, IKB A.G.'s argument that Wilmington

Trust had an overarching duty that encompassed the duties of all managing entities is simply unreasonable in light of the plain language of the agreements that generally shields Wilmington Trust from obligations. There is no question that Wilmington Trust was empowered to take action on behalf of the trusts, but that does not translate into a duty. Furthermore, IKB A.G.'s argument that Wilmington Trust can be held liable for its own misconduct or gross negligence is unavailing. While it is true that Section 6.01 of the trust agreements permits liability for Wilmington Trust based on "willful misconduct, gross negligence or bad faith or grossly negligent failure to act," (Doc. 63, Ex. B), those claims sound in tort, not breach of contract. IKB A.G. cannot successfully plead breach of contract by pointing to the potential of tort liability. Therefore, we find that IKB A.G. has failed to plead breach of duty by Wilmington Trust and Count I of the Complaint must be dismissed.

### 2.    Bad Faith Claim

We turn now to IKB A.G.'s bad faith claim. IKB A.G. alleges that Wilmington Trust breached the implied covenant of good faith and fair dealing by "(a) fail[ing] to act despite its knowledge of the rampant breaches of the Trusts' rights under the Governing Agreements and (b) fail[ing] to give notice of defaults under the Governing Agreements." (Compl. ¶ 327).

The implied covenant of good faith and fair dealing "requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009) (quoting *Dunlap v. State Farm Fire & Cas. Co.*, 878, A.2d 434, 442 (Del. 2005)). As further explained by the Delaware Court of Chancery:

> The implied covenant cannot be invoked to override the express terms of the contract. Moreover, rather than constituting a free floating duty imposed on a contracting party, the implied covenant can only be used conservatively to ensure the parties' reasonable expectations are fulfilled. Thus, to state a claim for breach of the implied covenant, [a plaintiff] must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff. General allegations of bad faith conduct are not sufficient. Rather, the plaintiff must allege a specific implied contractual obligation and allege how the violation of that obligation denied the plaintiff the fruits of the contract. Consistent with its narrow purpose, the implied covenant is only rarely invoked successfully.

*Id.* (internal quotations omitted). The term "good faith" "contemplates 'faithfulness to the scope, purpose, and terms of the parties' contract.'" *Allen v. El Paso Pipeline GP Co., L.L.C.*, 113 A.3d 167, 183 (Del. Ch. 2014) (quoting *Gerber v. Enter. Prods. Hldgs., LLC*, 67 A.3d 400, 419 (Del. 2013)). Thus, the concept of the implied covenant turns "not on a court's belief about what was morally or equitably appropriate under the circumstances, but rather 'on the contract itself and what the parties would have agreed upon had the issue arisen when they were bargaining originally.'" *Id.* (quoting *Gerber*, 67 A.3d at 419).

IKB A.G.'s bad faith claim echoes its breach of contract claim. The same contractual "duties" that Wilmington allegedly breached are pled as implied "duties" that Wilmington allegedly failed to satisfy in bad faith. We have already found, however, that the duties that were breached were not the responsibility of Wilmington Trust. We further found that those duties were specifically imposed upon other managing entities. Thus, the inaction on which IKB A.G. rests its breach of contract claim was expressly addressed in the governing agreements. IKB A.G. cannot override the clear and unambiguous terms of the governing agreements with an implied covenant claim. Absent any allegations of other implied duties, IKB A.G. has failed to plead a violation of the implied covenant, and Count II also must be dismissed.

## V.     CONCLUSION

Consistent with our foregoing analysis, we shall grant Wilmington Trust's Motion to Dismiss in its entirety.[3] We will issue a separate order in accordance with this memorandum.


  s/ John E. Jones III
John E. Jones III
United States District Judge

_____

[3] Our dismissal includes the nominal defendants who were named only as necessary parties but were not active participants in the litigation. Indeed, Plaintiffs do not state any specific allegations against them.